IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KELVIN EDUARDO MARTINEZ, | No. 2:13-CV-0067-CMK-P |
| Petitioner, | |
| vs. | MEMORANDUM OPINION AND ORDER |
| LUIS, | |
| Respondent. | |
| _____/ | |

Petitioner, a state prisoner proceeding pro se, brings this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Pursuant to the written consent of all parties, this case is before the undersigned as the presiding judge for all purposes, including entry of final judgment. See 28 U.S.C. § 636©. Pending before the court are petitioner's petition for a writ of habeas corpus (Doc. 1), respondent's answer (Doc. 9), and petitioner's reply (Doc. 12).

/ / /

/ / /

/ / /

/ / /

/ / /

1

# I. BACKGROUND

A. **Facts**[1]

The state court recited the following facts, and petitioner has not offered any clear and convincing evidence to rebut the presumption that these facts are correct:

> A jury convicted defendants Kelvin Eduardo Martinez (Martinez) and Valentino Antonio Andrade (Andrade) of residential burglary, and also convicted Martinez of misdemeanor vandalism. (Citation omitted). The trial court sustained allegations Martinez had a prior serious felony conviction which also qualified as a strike. (Citation omitted). The trial court sentenced Martinez to 13 years in state prison. . . .
>
> Martinez raised overlapping claims arising from the midtrial disclosure of a police report about the vandalism. He claims the report's late disclosure constituted a statutory discovery violation, a due process or *Brady* violation, and prosecutorial misconduct. . . . We shall affirm.
>
> * * *
>
> Angela Huerta testified she lived in a West Sacramento apartment, and extended family members lived in the next building. On the evening of June 14, 2009, she saw defendants carrying a television belonging to her extended family – namely, Maria Garcia. Andrade was carrying something else under his arm as well. She knew Andrade, because he "used to live in front of us[,]" but she had never seen Martinez before. She could see both of their faces. When she called out, "'Valentino [referring to Andrade], that's Maria's TV,]'" and told him not to get into more trouble, defendants dropped the television, then picked it up and left. Andrade turned, seemed to recognize her, and said, "'Oh, motherfucker.'" She identified Martinez to the police as "Travieso" because that is the name her 14-year-old nephew, Robert Garcia [also known as "Roberto"], told her Martinez used, but she did not know Martinez. She and Robert gave chase in different directions, and about three minutes later or less, she saw defendants, still carrying the television.
>
> Maria Garcia testified her television was taken without her permissions while she was at work.

///

---

[1] Pursuant to 28 U.S.C. § 2254(e)(1), ". . . a determination of a factual issue made by a State court shall be presumed to be correct." Petitioner bears the burden of rebutting this presumption by clear and convincing evidence. See id. These facts are, therefore, drawn from the state court's opinion(s), lodged in this court. Petitioner may also be referred to as "defendant."

2

      Maria's daughter, Patricia Garcia [also known as "Patty"], aged 17, testified she saw defendants at the K Street Mall in downtown Sacramento, earlier on the day of the burglary. Patricia had known Andrade for a few years. He had brought Martinez – calling him "Travieso" – to her house a couple of days before the theft, and she had returned home the day before the theft to find them inside, with her sister, Mayra Naranja, braiding their hair. When she bumped into them at the mall, they smoked marijuana by the river, then wanted her to help sneak them into a movie theater. She declined, and after she saw a movie and went to a friend's house, she received a call about the stolen television. After she spoke with Robert (her brother) and Huerta (her aunt), she went looking for defendants in her car. She spotted them, without the television, and they saw her; by the time she made a u-turn, they were gone. Later, she discovered her laptop and tennis shoes, which had been next to the television, were missing. Before she had left for the movies, she had jokingly told Robert and his girlfriend Vanessa that if her shoes or laptop were missing, she would blame Vanessa. When Robert called her about the burglary, she first thought he was joking.

      The next day, after Patricia heard Robert scream, "'He's back[,]'" she looked through a window and saw Martinez run away. Downstairs, she saw a rock and broken glass on the kitchen floor. Later that day, she saw Martinez at a market, and when she and Naranja accused Martinez of taking the television, he denied it, and then started pushing and hitting Naranja. When Patricia approached him, "he swung and he hit me in my head." After a peace officer drove by, Martinez fled.

      During cross-examination, Patricia stated the rock-throwing incident (rock incident) had been reported to the police, who came to the house to take a report.

In a footnote, the state court added: "This testimony led to the midtrial revelation of a police report. . . ." The state court continued as follows:

      Officer Mark Flatley testified he found no signs of forced entry into Maria's apartment the night of the burglary. He searched Andrade's aunt's apartment, in the same complex, but did not find the television.

      During Officer Flatley's cross-examination, he testified he had never heard of a rock incident or report before hearing Patricia's trial testimony, although it would be important information for the burglary investigation. He did not know if a detective had been assigned to the case.

      Robert testified that when Patricia left, she joked about Vanessa wanting to steal her shoes. When Robert walked Vanessa home, he left the door unlocked. When he returned about 10 minutes later, the door was ajar and the television was gone. He ran out and saw Huerta, who "was coming to tell me that they just took the TV." When Huerta told him to go

> in one direction, he glimpsed two men with two braided ponytails, and because of their hair and they way they were dressed, he identified them to the police as the men who had come to the apartment a couple of days before, asking for his sister, Naranja. He could not tell if they had anything in their hands. He identified Martinez as the man who had come to the house on an unknown day. He knew Martinez as "Travieso." He did not see the faces of the men he chased and could only say Martinez's appearance was consistent with one of the men, and the other man also had braided hair. A day or two later, he saw Martinez on a bicycle and saw him pick up a rock and throw it through the apartment window. Because he had just come out of the show, he called to Patricia: "'He's back. He's back.'"
>
> A defense investigator testified that, based on Huerta's testimony, Huerta was about 57 feet from where she saw the men with the television. Andrade recalled Officer Flatley, who had taken a statement from Robert on the night of the burglary. Robert had said he had not seen the men carrying anything, but had described the perpetrators as two Hispanic men, 18 to 20 years old, with long, braided hair.

The state court then recounted the following facts regarding the midtrial discovery:

> During cross-examination, Patricia testified the rock incident had been reported to the police. After Officer Flatley testified on direct examination, and during a break outside the jury's presence, Martinez's counsel stated he had not known any officers investigated the rock incident and no police report about it had been disclosed. He conceded the prosecutor was "also unaware of any such report, but it blindsided me in cross-examination[.]" The prosecutor agreed to look into the matter, and Martinez's counsel said, "I absolutely accept that." Andrade's counsel stated the rock incident itself had been disclosed before Patricia testified at the preliminary hearing. Officer Flatley, the investigating officer for the burglary, said he had not even heard about the rock incident, let alone any police report about it, before trial.
>
> Before Robert appeared and testified, Martinez moved for a mistrial, contending that no one, including the prosecutor, had known that a report about the rock incident existed, and that the revelation had "put us in a position to be unable to prepare for impeachment." Counsel apparently planned to argue the rock incident had not occurred, and to argue that the police had not been called and the incident was first mentioned by the victim's family at the preliminary hearing – presumably thereby affecting the credibility of the testimony regarding the incident. As an alternative to a mistrial, counsel asked for a late-discovery instruction, although he conceded the prosecutor was not at fault, stating it was "the fault of law enforcement."
>
> The prosecutor stated she faxed the report to the defense immediately after she received it, and Martinez's counsel conceded the report was received "right after court Friday," "and there's no question whatsoever" the prosecutor did not know about it before Patricia testified.

4

> The trial court denied the mistrial motion, and the alternative request for a late-discovery instruction.

In another footnote, the state court observed:

> The trial court's ruling is reported as follows: "The Court also finds that there is no bad faith here on the part of the prosecution. That the report and the information regarding this incident was *known* to both sides, and that the prosecution immediately upon receipt of that information disclosed it to the defense." (Emphasis added). It is clear the trial court said or intended to say the report was *unknown*.

### B. Procedural History

Petitioner's conviction and sentence were affirmed on direct review by the California Court of Appeal and the California Supreme Court denied review. Petitioner's petitions for post-conviction relief were denied by the Yolo County Superior Court and California Court of Appeal. The California Supreme Court rejected petitioner's post-conviction petition filed in that court, stating as follows in a December 13, 2012, letter to petitioner:

> We hereby return unfiled your documents received today. In a letter dated November 30, 2012, you were advised that your petition for review was untimely, and you were required to submit an Application for Relief from Default explaining the reasons for your failure to file a timely petition for review. Our records disclose that you have not submitted an Application for Relief from Default and on December 10, 2012, the court lost jurisdiction to consider or grant relief of any nature in this case.

## II. STANDARDS OF REVIEW

Because this action was filed after April 26, 1996, the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") are presumptively applicable. See Lindh v. Murphy, 521 U.S. 320, 336 (1997); Calderon v. United States Dist. Ct. (Beeler), 128 F.3d 1283, 1287 (9th Cir. 1997), cert. denied, 522 U.S. 1099 (1998). The AEDPA does not, however, apply in all circumstances. When it is clear that a state court has not reached the merits of a petitioner's claim, because it was not raised in state court or because the court denied it on procedural grounds, the AEDPA deference scheme does not apply and a federal

1  habeas court must review the claim de novo. See Pirtle v. Morgan, 313 F.3d 1160 (9th Cir.
2  2002) (holding that the AEDPA did not apply where Washington Supreme Court refused to reach
3  petitioner's claim under its "re-litigation rule"); see also Killian v. Poole, 282 F.3d 1204, 1208
4  (9th Cir. 2002) (holding that, where state court denied petitioner an evidentiary hearing on
5  perjury claim, AEDPA did not apply because evidence of the perjury was adduced only at the
6  evidentiary hearing in federal court); Appel v. Horn, 250 F.3d 203, 210 (3d Cir.2001) (reviewing
7  petition de novo where state court had issued a ruling on the merits of a related claim, but not the
8  claim alleged by petitioner). When the state court does not reach the merits of a claim,
9  "concerns about comity and federalism . . . do not exist." Pirtle, 313 F. 3d at 1167.
10         Where AEDPA is applicable, federal habeas relief under 28 U.S.C. § 2254(d) is
11 not available for any claim decided on the merits in state court proceedings unless the state
12 court's adjudication of the claim:

>   (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
>   (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

17 Under § 2254(d)(1), federal habeas relief is available only where the state court's decision is
18 "contrary to" or represents an "unreasonable application of" clearly established law. Under both
19 standards, "clearly established law" means those holdings of the United States Supreme Court as
20 of the time of the relevant state court decision. See Carey v. Musladin, 549 U.S. 70, 74 (2006)
21 (citing Williams, 529 U.S. at 412) . "What matters are the holdings of the Supreme Court, not
22 the holdings of lower federal courts." Plumlee v. Masto, 512 F.3d 1204 (9th Cir. 2008) (en
23 banc). Supreme Court precedent is not clearly established law, and therefore federal habeas
24 relief is unavailable, unless it "squarely addresses" an issue. See Moses v. Payne, 555 F.3d 742,
25 753-54 (9th Cir. 2009) (citing Wright v. Van Patten, 552 U.S. 120, 28 S. Ct. 743, 746 (2008)).
26 For federal law to be clearly established, the Supreme Court must provide a "categorical answer"

to the question before the state court. See id.; see also Carey, 549 U.S. at 76-77 (holding that a state court's decision that a defendant was not prejudiced by spectators' conduct at trial was not contrary to, or an unreasonable application of, the Supreme Court's test for determining prejudice created by state conduct at trial because the Court had never applied the test to spectators' conduct). Circuit court precedent may not be used to fill open questions in the Supreme Court's holdings. See Carey, 549 U.S. at 74.

        In Williams v. Taylor, 529 U.S. 362 (2000) (O'Connor, J., concurring, garnering a majority of the Court), the United States Supreme Court explained these different standards. A state court decision is "contrary to" Supreme Court precedent if it is opposite to that reached by the Supreme Court on the same question of law, or if the state court decides the case differently than the Supreme Court has on a set of materially indistinguishable facts. See id. at 405. A state court decision is also "contrary to" established law if it applies a rule which contradicts the governing law set forth in Supreme Court cases. See id. In sum, the petitioner must demonstrate that Supreme Court precedent requires a contrary outcome because the state court applied the wrong legal rules. Thus, a state court decision applying the correct legal rule from Supreme Court cases to the facts of a particular case is not reviewed under the "contrary to" standard. See id. at 406. If a state court decision is "contrary to" clearly established law, it is reviewed to determine first whether it resulted in constitutional error. See Benn v. Lambert, 283 F.3d 1040, 1052 n.6 (9th Cir. 2002). If so, the next question is whether such error was structural, in which case federal habeas relief is warranted. See id. If the error was not structural, the final question is whether the error had a substantial and injurious effect on the verdict, or was harmless. See id.

        State court decisions are reviewed under the far more deferential "unreasonable application of" standard where it identifies the correct legal rule from Supreme Court cases, but unreasonably applies the rule to the facts of a particular case. See Wiggins v. Smith, 539 U.S. 510, 520 (2003). While declining to rule on the issue, the Supreme Court in Williams, suggested that federal habeas relief may be available under this standard where the state court either

unreasonably extends a legal principle to a new context where it should not apply, or unreasonably refuses to extend that principle to a new context where it should apply. See Williams, 529 U.S. at 408-09.  The Supreme Court has, however, made it clear that a state court decision is not an "unreasonable application of" controlling law simply because it is an erroneous or incorrect application of federal law. See id. at 410; see also Lockyer v. Andrade, 538 U.S. 63, 75-76 (2003).  An "unreasonable application of" controlling law cannot necessarily be found even where the federal habeas court concludes that the state court decision is clearly erroneous. See Lockyer, 538 U.S. at 75-76.  This is because "[t]he gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness." Id. at 75.  As with state court decisions which are "contrary to" established federal law, where a state court decision is an "unreasonable application of" controlling law, federal habeas relief is nonetheless unavailable if the error was non-structural and harmless. See Benn, 283 F.3d at 1052 n.6.

The "unreasonable application of" standard also applies where the state court denies a claim without providing any reasoning whatsoever. See Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003); Delgado v. Lewis, 233 F.3d 976, 982 (9th Cir. 2000).  Such decisions are considered adjudications on the merits and are, therefore, entitled to deference under the AEDPA.  See Green v. Lambert, 288 F.3d 1081 1089 (9th Cir. 2002); Delgado, 233 F.3d at 982. The federal habeas court assumes that state court applied the correct law and analyzes whether the state court's summary denial was based on an objectively unreasonable application of that law.  See Himes, 336 F.3d at 853; Delgado, 233 F.3d at 982.

### III. DISCUSSION

In his petition, petitioner raises the following four claims: (1) the midtrial disclosure of the rock incident police report violated petitioner's right to due process; (2) trial counsel was ineffective with respect to the midtrial disclosure of the rock incident police report; (3) the prosecutor committed misconduct with respect to the midtrial disclosure of the rock

incident police report; and (4) the trial court erred with respect to the midtrial disclosure of the rock incident police report.

**A.     Due Process**

The California Court of Appeal discussed this claim as follows:

> Martinez contends the late disclosure of the police report violated due process by depriving him of notice and an opportunity to defend the charges, and interfered with his right to effective counsel by undermining his trial counsel's anticipated strategy. We agree with the People this contention largely assumes a *Brady* violation. Noting the People's point that no *Brady* objection was lodged at trial, despite the trial court's clear pretrial admonition to counsel to specify the grounds of all objections, we continue with our analysis and hold there were no due process or *Brady* violations.

In denying the claim, the state court noted that, because the rock incident police report was not part of the record, it could not conclude that the it was favorable to petitioner, a prerequisite to showing a Brady v. Maryland, 373 U.S. 83 (1963).

As respondent correctly notes, a Brady violation occurs when evidence which is favorable to the defense – either because it is exculpatory or impeaching – is suppressed by the state resulting in prejudice to the defendant. See id.; see also Gentry v. Sinclair, 705 F.3d 884, 905 (9th Cir. 2013). In this case, petitioner has not established that the rock incident police report was favorable to his case. The report does not appear in the state court record and petitioner has not provided it to this court. For the same reason, petitioner fails to show that late disclosure of the report was prejudicial.

On the current record, the court finds that the state court's denial of petitioner's due process claim was neither contrary to nor based on an unreasonable application of clearly established Supreme Court precedent. See Phillips v. Woodford, 267 F.3d 966 (9th Cir. 2001).

/ / /

/ / /

/ / /

/ / /

B.      **Ineffective Assistance of Trial Counsel**

Respondent argues that petitioner's ineffective assistance of counsel claims is unexhausted. Under 28 U.S.C. § 2254(b), the exhaustion of available state remedies is required before claims can be granted by the federal court in a habeas corpus case. See Rose v. Lundy, 455 U.S. 509 (1982); see also Kelly v. Small, 315 F.3d 1063, 1066 (9th Cir. 2003); Hunt v. Pliler, 336 F.3d 839 (9th Cir. 2003). Claims may be denied on the merits notwithstanding lack of exhaustion. See 28 U.S.C. § 2254(b)(2). "A petitioner may satisfy the exhaustion requirement in two ways: (1) by providing the highest state court with an opportunity to rule on the merits of the claim . . .; or (2) by showing that at the time the petitioner filed the habeas petition in federal court no state remedies are available to the petitioner and the petitioner has not deliberately by-passed the state remedies." Batchelor v. Cupp , 693 F.2d 859, 862 (9th Cir. 1982) (citations omitted). The exhaustion doctrine is based on a policy of federal and state comity, designed to give state courts the initial opportunity to correct alleged constitutional deprivations. See Picard v. Connor, 404 U.S. 270, 275 (1971); see also Rose, 455 U.S. at 518.

Here, the record reflects that petitioner first raised his ineffective assistance of counsel claim on collateral review in a petition for habeas corpus filed in the Yolo County Superior Court. The record also reflects that petitioner never presented the claim to the California Supreme Court. While he did seek post-collateral review by the Court of Appeal, his petition was not filed in the California Supreme Court because petitioner failed to timely seek relief from default in that court. Because petitioner did not present his ineffective assistance of counsel claim to the state's highest court, it is unexhausted and will be dismissed.

C.      **Prosecutorial Misconduct**

Petitioner claims that the prosecutor committed misconduct with respect to the midtrial disclosure of the rock incident police report. Respondent argues that federal habeas review of this claim is barred due to a state court procedure default. Specifically, respondent observes that state court applied the "contemporaneous objection default" to deny petitioner's

claim, holding:

> As the People note, trial counsel did not claim the prosecutor committed *any* misconduct. Therefore, the contention of prosecutorial misconduct raised for the first time on appeal is forfeited. (Citations omitted).

Based on concerns of comity and federalism, federal courts will not review a habeas petitioner's claims if the state court decision denying relief relies on a state law ground that is independent of federal law and adequate to support the judgment. See Coleman v. Thompson, 501 U.S. 722 (1991); Harris v. Reed, 489 U.S. 255, 260-62 (1989). However, a discretionary state rule is not adequate to bar federal habeas corpus review. See Siripongs v. Calderon, 35 F.3d 1308 (9th Cir. 1994). Generally, the only state law grounds meeting these requirements are state procedural rules. Even if there is an independent and adequate state ground for the decision, the federal court may still consider the claim if the petitioner can demonstrate: (1) cause for the default and actual prejudice resulting from the alleged violation of federal law, or (2) a fundamental miscarriage of justice. See Harris, 489 U.S. at 262 (citing Murray v. Carrier, 477 U.S. 478, 485, 495 (1986)). In cases where the state court denies a claim based on a procedural default but also discusses the merits of the claim, the claim is nonetheless procedurally barred on federal habeas review unless the state court's decision fairly appears to rest primarily upon federal law. See Coleman, 501 U.S. at 737.

At the outset, the court observes that, in denying this claim, the California Court of Appeal discussed both the contemporaneous objection default as well as the merits. It does not, however, fairly appear that the state court's denial rested primarily upon federal law, largely because the state court's merits discussion was premised on state law principles governing prosecutorial misconduct. Therefore, despite the state court's discussion of the merits of petitioner's prosecutorial misconduct claim, this court will apply the procedural bar doctrine.

///

///

Under California law, ". . . an appellate court will not consider claims of error that could have been – but were not – raised in the trial court." People v. Vera, 15 Cal.4th 269, 275-76 (1997). In Rich v. Calderon, 187 F.3d 1064, 1066 (9th Cir. 1999), and Vansickel v. White, 166 F.3d 953 (9th Cir. 1997), the Ninth Circuit held that California's contemporaneous objection rule is an adequate and independent state procedural rule when properly invoked by the state courts. The Ninth Circuit has also concluded that the contemporaneous objection rule has been consistently applied by the California courts. See Melendez v. Pliler, 288 F.3d 1120, 1125 (9th Cir. 2002).

Because it does not fairly appear that the state court's denial of petitioner's prosecutorial misconduct claim rested primarily upon federal law, and because the contemporaneous objection default applied by the state court is adequate an independent procedural rule that has been consistently applied, the court finds that the claim is barred from federal habeas review. Petitioner has made no showing whatsoever of cause and prejudice or a fundamental miscarriage of justice so as to allow for review by this court despite the procedural default in state court.

**D.     Trial Court Errors**

Petitioner contends that the trial court erred by denying his motions for relief relating to the midtrial discovery issue. Specifically, petitioner argued in the trial court that he was entitled to either a mistrial or a late-discovery instruction due to the prosecutor's violation of California discovery rules. A writ of habeas corpus is available under 28 U.S.C. § 2254 only on the basis of a transgression of federal law binding on the state courts. See Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985); Gutierrez v. Griggs, 695 F.2d 1195, 1197 (9th Cir. 1983). It is not available for alleged error in the interpretation or application of state law. Middleton, 768 F.2d at 1085; see also Lincoln v. Sunn, 807 F.2d 805, 814 (9th Cir. 1987); Givens v. Housewright, 786 F.2d 1378, 1381 (9th Cir. 1986). Habeas corpus cannot be utilized to try state issues de novo. See Milton v. Wainwright, 407 U.S. 371, 377 (1972).

The court agrees with respondent that petitioner's claim that the trial court erred in applying state laws is not cognizable. The California Court of Appeal rejected this claim on state law grounds, holding that the trial court did not abuse its discretion with respect to application of state law. Petitioner cannot re-try the issue here.

### IV.  CONCLUSION

Pursuant to Rule 11(a) of the Federal Rules Governing Section 2254 Cases, the court has considered whether to issue a certificate of appealability. Before petitioner can appeal this decision, a certificate of appealability must issue. See 28 U.S.C. § 2253©; Fed. R. App. P. 22(b). Where the petition is denied on the merits, a certificate of appealability may issue under 28 U.S.C. § 2253 "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The court must either issue a certificate of appealability indicating which issues satisfy the required showing or must state the reasons why such a certificate should not issue. See Fed. R. App. P. 22(b). Where the petition is dismissed on procedural grounds, a certificate of appealability "should issue if the prisoner can show:  (1) 'that jurists of reason would find it debatable whether the district court was correct in its procedural ruling'; and (2) 'that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right.'" Morris v. Woodford, 229 F.3d 775, 780 (9th Cir. 2000) (quoting Slack v. McDaniel, 529 U.S. 473, 120 S.Ct. 1595, 1604 (2000)). For the reasons set forth above, the court finds that issuance of a certificate of appealability is not warranted in this case.

/ / /

/ / /

/ / /

/ / /

/ / /

Based on the foregoing, IT IS HEREBY ORDERED that:

1. Petitioner's ineffective assistance of counsel claim is dismissed as unexhausted;

2. Petitioner's remaining claims are denied;

3. The court declines to issue a certificate of appealability; and

4. The Clerk of the Court is directed to enter judgment and close this file.

DATED: January 28, 2016

_____
**CRAIG M. KELLISON**
UNITED STATES MAGISTRATE JUDGE